IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.

JENNIFER WILCOX and ANDREW DIPRETORO,

Plaintiffs

v.

ALEXANDER PANIO, JR.; MARY PANIO; ADOLESCENT AND FAMILY INSTITUTE OF COLORADO, INC., a Colorado Corporation; EDRA WEISS; WHITNEY HARRAH; CAROL OLSON; CARLA DAMICONE; and JANE JORDAN,

Defendants

---

**COMPLAINT AND JURY DEMAND**

---

COME NOW the Plaintiffs, JENNIFER WILCOX and ANDREW DIPRETORO, by and through counsel, the Law Offices of J.M. Reinan, P.C., and for their Complaint and Jury Demand against Defendants, ALEXANDER PANIO, JR.; MARY PANIO; ADOLESCENT AND FAMILY INSTITUTE OF COLORADO, INC., a Colorado Corporation; EDRA WEISS; CAROL OLSON; WHITNEY HARRAH; CARLA DAMICONE; and JANE JORDAN, state and aver as follows:

# I. INTRODUCTION

## Parties and Venue

1. Plaintiff Jennifer Wilcox is the mother of Plaintiff Andrew DiPretoro. Mr. DiPretoro is 19 years old.

2. Plaintiffs reside at 8735 S. Aberdeen Circle, Highlands Ranch, Colorado 80130. Plaintiffs are citizens of Colorado.

3. Plaintiffs are former patients of the Adolescent and Family Institute of Colorado, Inc., a Colorado corporation, herein "AFIC."

4. Defendant AFIC holds itself out as a Psychiatric Residential Treatment Center for adolescents, young adults and their families. It is located at 10001 W. 32nd Avenue Wheat Ridge, Colorado 80033.

5. AFIC is owned, operated and controlled by Defendant Panio, herein "Panio," along with his wife, Defendant Mary Panio, herein "Mary Panio." Panio and Mary Panio are citizens of Colorado.

6. Panio and Mary Panio were at all times relevant the co-chairs of AFIC's Executive Committee and made all final clinical and financial decisions for AFIC.

7. Defendant Edra Weiss, "Weiss," is a licensed physician specializing in pediatrics. Weiss was at all times relevant AFIC's medical director as well as Andrew DiPretoro's treating physician. Weiss is a citizen of Colorado.

8. Defendant Carol Olson, "Olson," is an advanced practice registered nurse with prescriptive authority. Olson at all times relevant acted as Andrew DiPretoro's psychiatric provider at AFIC. Olson is a citizen of

Colorado.

9. Defendant Whitney Harrah, "Harrah," is a licensed professional counselor and is an employee or agent of AFIC, acting in the role of its marketing and admissions person, clinical director and as Panio's lieutenant. Defendant Harrah at all times relevant provided therapy, as well as marketing, admissions and support services for AFIC. Harrah is a citizen of Colorado.

10. Defendant Carla Damicone, "Damicone," is an unlicensed psychotherapist and certified addictions counselor employed by AFIC during all times relevant. Damicone is a citizen of Colorado.

11. Defendant Jane Jordan, LPN, "Jordan," was at all times relevant a licensed practical nurse employed by AFIC. Jordan at times relevant provided nursing care to Andrew DiPretoro. Jordan is a citizen of Colorado.

12. Defendants, with the exception of Weiss, are collectively referred to as the "AFIC Defendants" due to their close collaboration and conspiracy regarding the facts alleged herein.

13. The District of Colorado has jurisdiction over this matter pursuant to 28 U.S.C. § 1331. This matter involves a federal question, including an action brought under 18 U.S.C. § 1961 *et seq*.

14. Venue is proper in the District of Colorado pursuant to 18 U.S.C. §

1965(a) as all parties, including the RICO Defendants, reside within Colorado.

15. The Court has discretionary jurisdiction over the pendent state law claims as all claims derive from a common nucleus of operative facts.

**Defendant Alexander Panio's fraudulent and deceptive representation of his academic and professional credentials**

16. Defendant Panio created AFIC, created its program, co-owns AFIC and controls the therapy and services provided by and through AFIC. Panio is also the *de facto* chief clinician of AFIC.

17. Panio refers to himself exclusively as "Doctor" or "Dr. Panio." Panio makes patients and staff refer to him as "Doctor" or "Dr. Panio," even though he is not a doctor, did not go to medical school, did not go to psychology school, is not licensed and has a PhD from an unaccredited diploma mill.

18. The diploma mill was California Western University, which is now defunct. Panio purchased this fraudulent PhD to further bolster his scheme to defraud and deceive his patients and their insurance providers.

19. At the time Panio purchased his PhD certificate, California Western University was not accredited by any accrediting organization and provided degrees in exchange for money and "life experience."

20. Panio did not undergo the kinds of rigorous education, class

attendance, participation, internships, training, testing, dissertation work or licensure required of real PhD recipients or clinical psychologists under C.R.S. § 12-43-301 *et seq.*

21. Panio has been defrauding the world at large in regard to his academic background and credentials for decades. As early as 1970, before he purchased his PhD certificate, Panio referred to himself as "Dr. Panio" and expected others to address him that way. Panio also occasionally fraudulently used an "MD" suffix to give others the appearance that he had a medical degree. Panio fraudulently referred to himself as a "doctor" while teaching at Northwestern University and, upon information and belief, defrauded Northwestern University as to his education and credentials.

22. Panio tells actual and prospective AFIC patients that he is a "psychologist" and a "clinical psychologist," although he is neither, in violation of C.R.S. § 12-43-305(1).

23. Panio also fraudulently represented himself as a "clinical psychologist" in an academic paper that was used as the basis for his PhD dissertation.

24. Panio's fraudulent misrepresentation of himself extends not only to academic achievements, but also to other personal and professional achievements.

25.As early as the late 1990s, AFIC, Panio and Mary Panio were the subject of a regulatory investigation concerning these Defendants' conduct as well as Defendant Panio's credentials.

26.On March 31, 1998, Harry Chance, a Jefferson County Social Services caseworker, filed a written complaint with the State of Colorado concerning Panio's outrageous conduct toward a young boy placed at AFIC by Mr. Chance. According to Mr. Chance, Panio and AFIC openly abused and humiliated the boy:

> During the interview the work"fuck" of "fucking" was used liberally. It was also used by all but one of the staff in their conversations with this young man and his father. I felt this young man was trying to answer the questions as best he knew how and was making an honest effort to be accepted by AFIC. Thinking back, I should have ended the interview myself and taken him back to Mt. View. Incarceration is more humane.
>
> Dr. Panio said such things to him as "have you ever taken a shit and forgotten to wipe your ass?", "have you ever put your dick in a garbage disposal?", "I think you would make a nice girlfriend for someone in prison", "maybe it's because you're stupid", "every time you flap your lips, you tell fucking lies". Is this indicative of the kind of treatment of the State of Colorado condones and licenses? I feel if some media person got wind of this it would be very embarrassing to the State Department.

27. On December 21, 1999, the parent of an AFIC patient filed a complaint with the State of Colorado regarding Panio's lack of licensure and falsified credentials.

28.In that complaint, the complainant noted that Panio had falsely advertised his credentials in written materials and engaged in the psychological diagnosis and treatment of patients without a license. Among other things, Panio was accused of falsely holding himself out as a

psychologist, falsely holding himself out as having a PhD, and falsely holding himself out as a Certified Alcohol Counselor III, "CAC-III:"

> As I mentioned to you during our conversation, I spoke with Amos Martinez of the Colorado Department of Regulatory Agencies on December 15, 1999. At that time, Mr. Martinez told me that Alex Panio is practicing illegally in the State of Colorado, that he practicing in violation of a Court Order, and that his doctorate is an invalid, mail-order degree. Mr. Panio is not a Psychologist, he is not a Ph.D. and he is not a Certified Addictions Counselor III, as he holds himself out to be, either by inference or through the use of his self-produced written materials.
>
> I am enclosing copies of Mr. Panio's written materials, which were mailed to me by AFIC sometime in early March of 1999. The materials clearly state that Mr. Panio is the C.E.O. (Chief Executive Officer) of AFIC (The Adolescent and Family Institute of Colorado, Inc.), that he is a Ph.D., and that the Chief Executive Officer of AFIC is a Ph.D. and a CAC III. The originals of these materials have been forwarded to Mr. Martinez at the Department of Regulatory Agencies.
>
> My son, who is 17 years of age, has been at AFIC since September 28, 1999, and truly believes the Mr. Panio is a Psychologist and his Addictions Counselor. My son has told me of conversations between himself and Mr. Panio which were completely inappropriate, considering the fact that Mr. Panio has no valid credentials and is not licensed to engage in the counseling of my son in any way.
>
> Mr. Panio participated directly in the evaluation and diagnosis of my son's problems, he has illegally counseled my son, he has personally diagnosed my psyche, and he has personally made recommendations -- all under the presumption that he is a fully accredited Ph.D. and a licensed counselor.

29.During this time, Panio and AFIC were sued by multiple patients for a pattern of abusive and negligent conduct.

30.Despite Defendants' clear knowledge of their fraudulent, abusive, negligent and unlawful conduct, Defendants Panio, Mary Panio and AFIC have endeavored to continue upon this pattern of illegal conduct.

**AFIC's marketing and advertising program and other representations of fact**

31.All of AFIC's patients, including Plaintiffs, are required to thoroughly read and rely on AFIC's Internet website as a pre-condition of admission to AFIC's family and adolescent treatment program.

32.The AFIC Defendants all participated in and/or tolerated and ratified the creation and/or dissemination of the promises and representations

contained on AFIC's Internet website.

33. AFIC's Internet website repeatedly promises and advertises that it provides family therapy and inpatient care by and through a staff of board-certified psychiatrists and other highly credentialed masters and doctoral professionals.

34. It promises and represents that its program is unique and designed specifically to provide therapy to the whole family without causing fragmentation of the family.

35. Among other things, AFIC promises:

a) AFIC has an "exceptional family focused" treatment program;

b) [AFIC advocates] for the safety and development of the family unit;

c) Adolescents and their family members are not fragmented from each

other;

d) AFIC's program alleviates immediate adolescent and family distress by addressing the whole family unit in a comprehensive treatment program;

e) AFIC's focus with the parents(s) is specifically aimed at the

preservation, renegotiation, and further development of their marital relationship;

f) The goal of the Institute is to engage the family system, reorganize the parental level of functioning to the executive level;

g) The Institute is a unique family system focused therapy program-unlike any other that deals with adolescents;

h) The level of satisfaction and outcome performances with AFIC are extremely favorable;

i) AFIC provides comprehensive 24-hour services by a team of experienced professionals in the psychiatric-medical, nursing, mental health, counseling and educational fields;

j) [AFIC offers] exceptional care for young people;

k) Adolescent patients' medications will be used and titrated on an individual basis by board certified psychiatrists;

l) Panio has a PhD in psychology;

m) Panio is a clinical psychologist;

n) Adolescents will be followed by a Diplomat of the American Board of Psychiatry and Neurology, certified by the American Board of Adolescent Psychiatry, or graduate

fellows in child psychiatry from the University of Colorado Medical School, who provide clinical consultation and medication assessments;

o) AFIC has a Staff Psychiatrist: (M.D.) Diplomat of the American Board of Psychiatry and Neurology, to provide clinical consultation and psychiatric medication assessments;

p) AFIC's Primary Therapists are Master's and Doctoral level therapists who represent various clinical disciplines with extensive training and supervision in adolescent and family therapy treatment;

q) AFIC represents a unique blend of clinical, medical, and educational experiences in therapeutic heritage; and

r) Family members participate in decisions and the course of treatment.

36. In order to urgently secure admission of prospective AFIC patients needing immediate placement in a residential facility, Defendants Panio and Harrah—posing as knowledgeable, licensed and credentialed professionals—also use high-pressure sales tactics, including advising families, *inter alia*:

a) If the troubled teen is not immediately admitted to AFIC for residential that he or she will die or go to prison;

b) There is absolutely no other facility in Colorado with comparable expertise or experience to effectively treat the troubled child;

c) AFIC is unique in its approach and has a success rate of over 80%;

d) This will be the last counseling program your family will ever need;

e) The troubled child's problems are caused by the parents, who can no longer handle the child and also need AFIC's help; and

f) The immediate admission to AFIC is a life or death decision that must be made there and now.

**AFIC's promises, representations and non-disclosures are knowingly false, deceptive and fraudulent**

37. Many of the material facts, promises and representations made in the AFIC Internet website at all times relevant were knowingly false, fraudulent and deceptive. Among other things, during times relevant:

a) AFIC did not have any board certified psychiatrists on staff

or in a consulting or supervising role;

b) AFIC did not involve board certified psychiatrists in medication decisions;

c) AFIC was not a psychiatric hospital;

d) All of AFIC's "psychiatric" care was provided by a nurse, Defendant Olson, and upon the directions of the unlicensed Panio;

e) AFIC's family therapy program specifically included the triangulation and fragmentation of family members and the destruction of the family unit in many cases;

f) Panio does not have a legitimate PhD, is not licensed, is not a psychologist and is not a medical doctor or psychiatrist;

g) AFIC did not have any doctoral level therapists;

h) AFIC did not have any licensed Marriage and Family Therapists;

i) Many of AFIC's primary therapists were unlicensed, including Damicone;

j) Many of AFIC's providers were not licensed or qualified to perform the duties to which they were assigned;

k) Much of the "medical" direction of AFIC came from its

fraudulent use of Weiss's rubber stamp;

l) AFIC's program is destructive to marriage and the family unit; and

m) AFIC's therapy program is dictatorial. The input of family members is not only discouraged but often ridiculed and dismissed.

38.Defendants actively conceal from actual and potential patients, including Plaintiff, material facts, including, *inter alia*:

a) Panio's lack of licensure;

b) The fact that Panio's PhD was not legitimately obtained;

c) Panio's true educational background and credentials;

d) AFIC's lack of supervision or oversight by a licensed psychiatrist;

e) The fact that all psychiatric treatment at AFIC is provided by a nurse, Defendant Olson;

f) That patient diagnoses are made without a proper, objective medical assessment or evaluation and not by an individual with authority to make the diagnoses; and

g) The fact that AFIC regularly hired, utilized and retained staff who were not licensed to perform their stated duties.

39.The AFIC Defendants further regularly defraud AFIC patients' insurance companies by causing the filing of fraudulent claims and by providing false and deceptive information to these insurance companies regarding the conditions, treatments, progress and diagnoses of AFIC patients, including Plaintiffs.

40.Defendant Olson, a registered nurse, has also falsely held herself out as a medical doctor and psychiatrist on an Internet website.

41.Defendants AFIC, Panio, Mary Panio and Harrah also tolerate, ratify and acquiesce to the use of unqualified, unlicensed therapists at AFIC as well as the use of Defendant Jordan to carry out acts beyond the legal scope of her practice as a licensed practical nurse.

**Fraudulent use of Defendant Weiss' Signature Stamp**

42.Because AFIC has no physicians on staff—contrary to its published representations—it requires access to a physician's signature for the purpose of filing insurance claims, for the purpose of securing physician orders and for the purpose of completing paperwork such as medical charts and other documentation.

43.At some point in time prior to 1998, AFIC and its employees, including Panio, came into possession of a rubber stamp with Defendant Weiss's signature embossed upon it.

44.AFIC and its employees fraudulently and without authorization used Defendant Weiss's signature stamp, repeatedly, for the purpose of filing bogus insurance claims forms.

45.Upon information and belief, these bogus insurance claims forms were sent through the U.S. Mails and/or through interstate wires.

46.AFIC and its employees fraudulently and without authorization used Defendant Weiss's signature stamp, repeatedly, for the purpose of making bogus physician orders for AFIC patients.

47.AFIC and its employees fraudulently and without authorization used Defendant Weiss' signature stamp, repeatedly, for the purpose of completing AFIC patient charts and other regulatory paperwork for AFIC patients.

48.Upon information and belief, Defendant Weiss did not give AFIC or its employees permission to use her signature stamp for these purposes.

49.AFIC and its agents and employees, including Panio and Mary Panio, have known, since at least July 28, 1998, that the use of this signature stamp was inappropriate and unauthorized.

50.The issue of using Weiss' rubber stamp signature was made known to AFIC, Panio and Mary Panio through a letter from the Colorado Department of Human Services wherein the Department instructed AFIC,

Panio and Mary Panio that the use of the signature stamp—which was then contained on all AFIC patient charts—was inappropriate.

51.In response, AFIC, Panio and Mary Panio falsely and fraudulently advised the State of Colorado, through an August 31, 1998 letter sent through the U.S. Mail, that Defendant Weiss had authorized the use of the signature stamp and had approved its use on each of the AFIC patient charts.

**Pattern of Similar Conduct Perpetrated on Others**

52.Defendants have engaged in similarly wrongful, deceptive and fraudulent acts against numerous other AFIC patients and family members.

**Donabedian Family**

53.Chris Donabedian is a young man who suffers from schizophrenia.

54.Starting in approximately 2008, Chris Donabedian began to show signs and symptoms of mental illness, including increasingly poor performance at school, truancy from school, substance abuse and depression.

55.On March 5, 2010, Chris Donabedian experienced a bout of profound psychosis while at home, during which he stuck his mother with a knife. The incident caused minor injury, requiring two stitches.

56.As a result of that incident, Chris Donabedian was charged with a crime by the El Paso County District Attorney's office.

57.Chris Donabedian was later released from detention so that he

could obtain skilled services for his mental illness. The court ordered him to remain in Colorado until the completion of his criminal matter.

58.In March 2010, Chris Donabedian was admitted to Penrose-St. Francis Hospital in Colorado Springs, where his psychiatrists prescribed Celexa and Geodon to control his psychosis and depression. Since Penrose could not treat Chris long-term, a referral was made to AFIC for inpatient care.

59.Prior to contacting AFIC, Chris's parents, Aimee and Stephen Donabedian, read and relied upon AFIC's fraudulent advertising and marketing materials, described above, which Penrose employees obtained directly from AFIC's Internet website and gave to Mrs. Donabedian.

60.The Donabedians set up an intake meeting with AFIC for March 16, 2010. One day prior to the intake--and prior to any of the Defendants even meeting Chris Donabedian--Defendant Weiss drafted a "Physician's Statement Requesting Homebound Services." In that March 15, 2010 document, Defendant Weiss fraudulently represented that she was Christopher Donabedian's physician and that she had diagnosed Christopher Donabedian as suffering from "Adaptive Capacity and Adjustment Issues."

61.That March 15, 2010 document was transmitted through the wires, through the U.S. Mail, or both.

62. At the initial admission and intake meeting one day later, Defendant Panio boasted of his background and accomplishments in order to close the sale on Plaintiffs. He further extortionately threatened Mrs. Donabedian that if Chris was not admitted to the AFIC program, Chris would never recover and that he "would be in prison within two years." This was particularly troubling in light of Chris's criminal prosecution.

63. Based upon these promises, representations and threats, the Donabedians agreed to become patients of the AFIC family therapy program on March 16, 2010.

64. On the day of Chris Donabedian's inpatient admission to AFIC, AFIC was provided a copy of his psychiatric medication prescriptions, including Celexa and Geodon.

65. The day after his admission to AFIC, Defendants Panio and Nelson changed Chris Donabedian's diagnosis from major depression with psychotic features to malingering and a "mixed personality disorder."

66. Defendants, working in concert with one another, fraudulently and wrongfully discontinued Chris Donabedian's Celexa and Geodon.

67. These psychotropic medications were necessary for Chris Donabedian's mental health and wellbeing and were discontinued over Chris Donabedian's protests and without the informed consent of the

Donabedians.

68. These medications were also discontinued abruptly and without tapering.

69. As a result of the discontinuation of these medications, Chris Donabedian lapsed into a profound state of psychosis. During this time, Chris hallucinated and, among other things, heard voices.

70. Chris Donabedian repeatedly requested that he be given his anti-psychotic medications to control the hallucinations. Defendants refused his repeated requests, leaving Chris frightened, upset, crying and hallucinating.

71. Defendant Panio engaged in at least two telephone discussions with Plaintiff's out of state insurance provider regarding Chris Donabedian's psychiatric condition and management during this period of time. The purpose of these interstate telephone calls was to advance Defendants' fraudulent scheme and in order to take the Donabedians' money and property.

72. On March 17, 2010 at 10:30 a.m., Defendant Panio had an interstate telephone discussion with the Donabedian's insurance provider on the east coast. During the course of this telephone discussion, Defendant Panio fraudulently held himself out as a licensed psychologist or psychiatrist for the purpose of obtaining insurance coverage for Chris Donabedian's stay

at AFIC.

73.During this telephone discussion with the insurance provider, Defendant Panio fraudulently referred to himself as a "doctor" and as a physician with prescriptive authority.

74.Defendant Panio illegally and fraudulently provided the insurance company's representative with his clinical diagnosis of Chris Donabedian and told the insurance representative how he intended to titrate Chris Donabedian's psychiatric medications.

75.During these conversations, Panio also discussed Chris Donabedian's change in clinical diagnosis from major depression with psychotic features to antisocial personality disorder and further referred to Mr. Donabedian as a "sociopath."

76.On March 18, 2010 at 1:00 pm, Defendant Panio had an interstate telephone conversation with Dr. Jeffrey Spiegel, a New York psychiatrist working for Chris Donabedian's insurance company.

77.During the course of that conversation, Panio fraudulently held himself out as a medical doctor and/or psychiatrist for the purpose of advancing the scheme to defraud the Donabedians and their insurance company.

78.During the conversation, Panio fraudulently "agreed to keep the

patient on an antidepressant, however did not want to use an antipsychotic."

79.On March 22, 2010 at 10:45 a.m., Defendant Harrah made an interstate telephone call to the Donabedians' insurance carrier for the purpose of advancing the overall scheme to defraud the Donabedians and their insurance carrier.

80.At no time did Chris Donabedian receive the psychiatric and medical services repeatedly promised in Defendants' advertising and marketing materials.

81.Chris Donabedian's primary "psychiatrist" was Defendant Olson. Defendant Olson provided all of the so-called "psychiatric consultations" noted in Chris Donabedian's chart.

82.At no time did an actual, licensed psychiatrist see Chris Donabedian during his stay at AFIC and at no time did an actual, licensed psychiatrist participate in the decision to discontinue Chris Donabedian's psychiatric medications.

83.At no time was Chris Donabedian seen, examined or interviewed by a licensed physician, including Defendant Weiss, who promised in the marketing and advertising materials that she would personally be directly involved with the medical aspects of Chris Donabedian's care.

84. Defendants Nelson and Panio also engaged in extortion in order to

keep Chris Donabedian as a patient at AFIC.

85.Among other things, Defendant Nelson falsely and extortionately told Chris he would "go directly to jail" if he rescinded his consent for therapy.

86.Chris Donabedian was also repeatedly told to make up, fabricate, and concoct homicidal plans for his mother. He was told to write these fabricated plans down on paper. He was told to engage in and document these fabrications after Chris Donabedian told AFIC staff that he never had a plan to kill his mother and that he did not intend to kill his mother during his psychotic break on March 5, 2010. He was made to create these false documents in order for Defendants to concoct a basis for keeping Chris Donabedian at AFIC and for the purpose of perpetrating a fraud on the Donabedians' insurance company.

87.Chris Donabedian was also forced to tell AFIC staff about privileged conversations he had with his defense attorney.

88.AFIC staff, including Defendant Nelson, told Mrs. Donabedian that if Chris were to be removed from the AFIC program, a report would be made to the criminal court, which would affect the underlying criminal case against him. Defendant Nelson extortionately implied that the contents of the report would depend on the Donabedians' level of cooperation with

AFIC, e.g., that if the Donabedians didn't blindly follow the AFIC Defendants' recommendations, that Chris's criminal case would suffer.

89.As a result of these false threats, extortion and coercion, Mrs. Donabedian reluctantly kept her son in the program, at the rate of $595.00 per day.

90.AFIC, Nelson and Panio did send a false and inflammatory letter through the U.S. Mail regarding Chris and his supposed diagnoses to the criminal court in order to injure Chris's standing with the Court and for the purpose of retaliating against the Donabedians. This letter was sent without permission and against the demands of Chris's attorney, who warned that the letter was defamatory, inappropriate and that there was no permission given to waive Chris's confidentiality.

91.The Donabedians and their insurance company were charged $21,770 for their care and treatment at AFIC.

92.On March 16, 2010, Defendant Olson created a bill for her services which was sent through the U.S. Mail to the Donabedians' insurance company. The bill was created and mailed for the purpose of advancing the fraudulent scheme described above.

93.On June 19, 2010, AFIC sent a bill for all of the Defendants' services to Stephen Donabedian through the U.S. Mail. The bill was created

and mailed for the purpose of advancing the fraudulent scheme described above.

94.On June 25, 2010 at 3:45 p.m., AFIC sent a facsimile transmission through interstate wires to California, for the purpose of advancing the fraudulent scheme described above. The interstate facsimile transmission included bills for all of the Defendants' services.

95.On September 28, 2010 at 3:40 p.m., AFIC sent a facsimile transmission through interstate wires to California, for the purpose of advancing the fraudulent scheme described above. The interstate facsimile transmission included bills for all of the Defendants' services.

96.On November 4, 2010, AFIC sent a facsimile transmission through interstate wires to Maryland, for the purpose of advancing the fraudulent scheme described above. The interstate facsimile transmission included bills for all of the Defendants' services. The bill was approved by Defendant Weiss and billed under her physician number and identifier.

97.On February 2, 2011, AFIC sent a bill for all of the Defendants' services to Stephen Donabedian through the U.S. Mail. The bill was created and mailed for the purpose of advancing the fraudulent scheme described above.

**Catherine Crane and Her Minor Son, Baby Roe**

98.Catherine Crane is the mother of Baby Roe, the fictitious name of her minor child whose name will not be publically disclosed due to privacy concerns. Baby Roe was admitted to AFIC on August 31, 2010. At the time of his admission, Baby Roe was 12 years old.

99.Upon information and belief, Defendant AFIC is only allowed to treat children between the ages of 13-18.

100. Prior to his admission, Baby Roe had spent most of that summer at The Children's Hospital, where he was diagnosed with a mood disorder. The team of physicians at The Children's Hospital had carefully prescribed Abilify and Sertraline for Baby Roe, and had titrated Baby Roe's medications so as to stabilize him on these medications.

101. Baby Roe's physicians at The Children's Hospital determined that Baby Roe required some additional weeks of inpatient treatment to further stabilize him. AFIC was recommended as a possibility to Ms. Crane by The Children's Hospital.

102. Ms. Crane researched AFIC by reviewing the promises and representations on AFIC's website. She relied upon those promises and representations in agreeing to seek her and her son's admission to that program.

103. Prior to meeting, seeing or evaluating Ms. Crane or Baby Roe,

a form was completed and signed with Defendant Weiss's signature stamp. The form stated that Baby Roe was Defendant Weiss's patient and that Defendant Weiss had diagnosed Baby Roe with adaptive capacity and adjustment issues that were severe.

104. Plaintiff and Baby Roe participated in an admissions session at AFIC on August 31, 2010. Present at the session were Defendants Panio, Harrah, Juarez and Jordan. Defendants Weiss and Olson were not present.

105. During the admissions meeting that occurred on August 31, Defendant Panio told Ms. Crane that one of the reasons to admit Baby Roe to AFIC was that only 10% of AFIC's patients were readmitted to a psychiatric program, whereas 80% of patients at The Children's Hospital program were readmitted to a program. Ms. Crane also relied upon this promise in deciding to admit her and her son to AFIC family therapy program.

106. Upon his admission to AFIC, Baby Roe's carefully titrated psychiatric medications were abruptly discontinued, upon information and belief, upon the direct order of Defendant Panio.

107. The order to discontinue the medications was made prior to Baby Roe being seen by either Defendant Olson or Defendant Weiss.

108. The abrupt discontinuation of the medications caused Baby Roe

to suffer psychiatric symptoms, including medication withdrawal and tremors.

109. AFIC, through its employees, thereafter began a campaign of triangulating Plaintiff's family in order to fracture the family and create a need for further therapy.

110. Among other things, Defendant Panio told Ms. Crane that she was "an enabler" and a "shitty fucking mom." He told Ms. Crane that her son's problems were her "fucking fault" and that now Baby Roe was "my fucking problem." These statements were made in front of the then 12 year old Baby Roe.

111. Defendant Panio also told Ms. Crane's ex-husband that he had diagnosed Ms. Crane as suffering from "Munchausen's by Proxy." Panio had no legal or factual basis for making such a diagnosis and only told the ex-husband this in order to further fracture the family and complicate Plaintiff's and Baby Roe's therapeutic process.

112. Shortly after his admission to the facility, Baby Roe was taken to a secluded room by two women, Defendants Weiss and Jordan.

113. Without telling Baby Roe what she was about to do, Weiss, without consent, pulled down Baby Roe's pants and fondled and manipulated his penis and scrotum.

114. Baby Roe was a virgin with no sexual history and there was thus no medical basis to examine or manipulate Baby Roe's genitals.

115. This was traumatizing and upsetting to Baby Roe.

116. Thereafter, Baby Roe was systematically abused, threatened, and frightened by AFIC staff. This all occurred while Baby Roe was experiencing mood disorder issues that were by then unmedicated.

117. Agents of AFIC, including Juarez and Panio, repeatedly used extortion, including threats to call the police and have Baby Roe brought to a facility where he would be potentially molested and abused by older, bigger boys.

118. Panio and AFIC staff repeatedly used profanity around and directed toward Baby Roe and Ms. Crane.

119. On one occasion, Panio told Baby Roe repeatedly to "sit the fuck down" and "shut the fuck up."

120. Panio also screamed at Baby Roe so abusively, loudly and threateningly that he caused Baby Roe to involuntarily urinate in his pants out of fear.

121. During a visit with Baby Roe at AFIC, Baby Roe complained to Ms. Crane about intense tooth pain that he was experiencing. AFIC staff, including Panio, had declined to provide Baby Roe with any care, treatment

or consultation for the tooth pain, instead falsely accusing Baby Roe of making up his symptoms and engaging in attention-seeking behavior.

122. In fact, Defendant Jordan actually consulted with "Dr. Panio" regarding Baby Roe's tooth pain. Defendant Panio unlawfully prescribed conservative treatment, telling Defendant Jordan to have Baby Roe rinse with warm salt water and hydrogen peroxide and to recheck him in 15 minutes.

123. When Ms. Crane ignored Defendant Panio's medical advice and instead gave Baby Roe Ibuprofen for his tooth pain, AFIC staff, including Panio, became upset and accused Ms. Crane of being an enabler who was undermining Baby Roe's progress at AFIC.

124. When Ms. Crane stated that she was going to bring her son to a dentist, AFIC staff, including Defendant Harrah, used threats and extortion to prevent Ms. Crane from taking Baby Roe out of the building.

125. Ms. Crane was ushered into the family therapy room, which also had cameras in it. Defendant Harrah and AFIC therapist Carla Damicone warned Ms. Crane that her conduct was going to be destructive to Baby Roe and attempted to talk her out of removing him from AFIC.

126. Ms. Crane took Baby Roe to the dentist, where he got treatment for his tooth issue. Ms. Crane also learned from Baby Roe of what was

going on at AFIC, including how he was being treated and abused.

127. Upon his return to AFIC, Defendant Harrah and Damicone, again on camera, interrogated Baby Roe about his conversations with his mother that occurred outside of AFIC. Baby Roe was made to feel that he had done something inappropriate by telling his mother about his experiences at AFIC.

128. Ultimately, having become increasingly skeptical of AFIC's program, Ms. Crane removed Baby Roe from AFIC.

129. Defendants' attempts to fragment family members and retaliate against Ms. Crane continued even after Baby Roe left the program.

130. On October 6, 2010, Defendant Panio provided testimony before Ms. Crane's divorce court, the Honorable Robert H. Russell of the Jefferson County District Court. In that testimony, Defendant Panio attempted to convince the divorce court of Baby Roe's continued need for AFIC's services.

131. During the course of the testimony, Defendant Panio made knowingly false statements and omissions concerning his background, education and licensure in order to falsely bolster his credibility with the court. Such statements were knowingly false and deceptive and were made with the intent of deceiving the court in the performance of its official

business.

132. These false, perjurious statements and omissions include, *inter alia*, the following:

a) That Panio has a PhD in "clinical social psychiatry;"

b) That AFIC has a regular staff psychiatrist on staff named Joe T. Martin;

c) That the standard procedure at AFIC was not to almost always discontinue its adolescent patients' medications upon admission to AFIC;

d) That Panio had at some point in time held a professional license as a mental health provider in the State of Colorado and had practiced as such in the past; and

e) That Panio was qualified to render a psychiatric diagnosis for Baby Roe, did diagnose Baby Roe, and was suited to disagree with licensed psychiatrists at The Children's Hospital who had previously diagnosed Baby Roe.

133. Defendant Panio's testimony provided under oath to the divorce court, as described above, was knowingly false because at the time the testimony was given, Defendant Panio knew, *inter alia*:

a) That he did not have a PhD in "clinical social psychiatry;"

b) That AFIC did not have a staff psychiatrist;

c) That Joe T. Martin was not AFIC's "regular staff psychiatrist;"

d) That it was AFIC's standard procedure to discontinue its adolescent patients' antidepressants and other psychotropic medications upon admission to AFIC;

e) That Defendant Panio had never been licensed in Colorado as a psychologist or as any other type of mental health practitioner and the he had never practiced as such in the past; and

f) That Defendant Panio, as an unlicensed person, was legally incapable of making psychiatric diagnoses or otherwise rendering opinions on mental illness, the efficacy of medications or the prognosis for a patient with mental illness.

134. Defendant Panio's false and perjurious testimony to the court was given with the intent of causing the court to make a decision that would financially benefit Panio, AFIC and the other Defendants.

135. Defendants received significant money and/or property from or on behalf of Ms. Crane as a result of their fraudulent scheme as set forth

above.

136. On August 31, 2010, AFIC sent a bill for all of the Defendants' services to Ms. Crane and Baby Roe's insurance company, Aetna, through the U.S. Mail. The bill was created and mailed for the purpose of advancing the fraudulent scheme described above. The bill contained billings from or on behalf of all of the Defendants herein, with the exception of Defendant Nelson. The bill was signed by or on behalf of Defendant Weiss.

137. On October 18, 2010, AFIC sent a bill for all of the Defendants' services to Ms. Crane's former husband, Todd Baucom, through the U.S. Mail. The bill was created and mailed for the purpose of advancing the fraudulent scheme described above. The bill contained billings from or on behalf of all of the Defendants herein, with the exception of Defendant Nelson.

**The James Family**

138. Taylor James was diagnosed by a psychiatrist with a mood disorder and Asperger's Syndrome when he was in sixth grade. As a result of these conditions, as well as emerging sexual identity issues, Taylor James was severely depressed and struggled with anger issues.

139. Taylor James' psychiatrists prescribed psychotropic medications to treat his psychiatric symptoms.

140. The James family was referred to AFIC by United Healthcare.

141. Prior to their admission to AFIC's family therapy program, Mr. and Mrs. James researched AFIC through its Internet website and agreed to become patients there based upon the promises and representations made on the AFIC website.

142. Taylor James was admitted to AFIC on August 16, 2010.

143. The initial intake therapy session included AFIC employees Panio, Scott Juarez and Carla Damicone. The intake therapy session lasted about an hour.

144. During the intake therapy session, Panio told the James family that he was a doctor. He spent considerable time boasting about his degrees and his background and specifically told the James family that he had worked for former First Lady, Mrs. Carter.

145. During the course of this initial therapy session, Panio also told the James family that Taylor had been misdiagnosed by prior doctors and that Taylor did not have bipolar disorder or Asperger's, but rather he had Borderline Personality Disorder.

146. The Jameses were provided with handouts regarding Borderline Personality Disorder from AFIC staff.

147. During this session, Panio insulted and humiliated Mr. and Mrs.

James, telling them that they were terrible parents, in front of their son. Panio remarked that they had been taking Taylor to therapists that weren't working. Panio assured them that he and AFIC would make it work for the James family and were the only facility capable of doing so.

148. Upon admission, Panio ordered Taylor to be taken off of all of his medications. Upon information and belief, this order was carried out by Defendant Olson without appropriate medical or psychiatric consultation and without sufficient information or basis.

149. Taylor James's medications were stopped abruptly without tapering. As a result, he became sick, sweaty, shaky and experienced symptoms of withdrawal as well as psychiatric symptoms.

150. Shortly after admission to AFIC, Taylor was taken by Defendants Weiss and Jordan for a genital examination.

151. Taylor's penis and scrotum were examined by these Defendants. They also measured his penis. This examination was conducted without informed consent and for no reasonable medical purpose.

152. While at AFIC, Panio and AFIC staff repeatedly told Taylor and Mr. and Mrs. James that Taylor did not have sexual identity issues, did not have bipolar disorder and did not have Asperger's. The family was told that Taylor was simply making symptoms up, was attention-seeking and

manipulating his parents as part of his Borderline Personality Disorder.

153. Despite AFIC and Panio's discussions about Taylor's made up symptoms and manipulative behavior, Panio told Mr. and Mrs. James that in order for the James' insurance company to cover Taylor's stay, AFIC would have to document Taylor as being more ill than he actually was.

154. Panio further asked the James family to lie about the nature and extent of Taylor's drug use in order for him to "look worse on paper" so that insurance would cover his stay at AFIC. The James family refused to lie about these issues.

155. Upon information and belief, Panio and other AFIC agents caused false and fraudulent paperwork to be sent through the U.S. mail to Plaintiffs' insurance company, United, in order to secure payment for Taylor's stay at AFIC.

156. Upon information and belief, the false and fraudulent information included, among other things, fictitious psychiatric diagnoses concerning Taylor James; fictitious or exaggerated psychiatric symptoms; and a fictitious plan of care for Taylor James.

157. At the same time, AFIC staff tried to convince Taylor James that his parents were incompetent parents who were responsible for his problems. AFIC staff referred to Mrs. James as a "bitch" to Taylor.

158. AFIC staff and therapists, including Panio and Defendant Nelson, repeatedly called Taylor outrageous and demeaning names and slurs. Defendant Nelson repeatedly referred to Taylor as a "faggot" and a "cum dumpster." Panio also called Taylor a "faggot" and a "cum dumpster."

159. Defendant Nelson, who was a Therapy Director at AFIC at the time and also Taylor James's primary therapist, also ridiculed Taylor for his weight issues, repeatedly referring to his "man boobs."

160. Defendant Juarez and Defendant Panio extortionately told Mr. and Mrs. James that Taylor would become a male prostitute if he didn't stay for additional treatment when the insurance denied it. Mr. and Mrs. James—fearful of the threat of Taylor becoming a prostitute—agreed to keep Taylor at AFIC even if the insurance coverage was denied.

161. AFIC staff further convinced Mr. and Mrs. James that in order for Taylor to get better, Mr. and Mrs. James would have to throw away most or nearly all of his favorite clothing, which they did.

162. All of this outrageous conduct and divisiveness, as well as the abrupt cessation of psychotropic medications, caused Taylor to become more depressed.

163. Shortly after his discharge from AFIC, Taylor expressed to his

mother that he was having suicidal thoughts from what had happened at AFIC. Mrs. James called AFIC in a panic and talked to Defendant Juarez. She told Defendant Juarez that Taylor was threatening to commit suicide; specifically, that he was going to take pills and drink nail polish remover.

164. Defendant Juarez advised Mrs. James that Taylor was only threatening and that he would not go through with it. In any case, Defendant Juarez advised Mrs. James not to try to stop any suicide attempt because that would only further encourage Taylor's attention-seeking and manipulative behavior and enable him further. She was told to let him take the pills if that was what he was going to do, let him learn a lesson, and then call an ambulance.

165. Taylor did attempt to overdose on pills and ingested nail polish remover. Mrs. James took him to the emergency room at Platte Valley Hospital where they pumped his stomach and transported him to The Children's Hospital, where he was admitted for a one-month stay. During that time, Taylor initially refused to go back on his medications because his therapists at AFIC had convinced him that he did not have a psychiatric diagnosis and that he did not need medications.

166. Ultimately, Taylor was stabilized on his medications and has continued to receive ongoing treatment for his issues.

167. Defendants were paid many thousands of dollars by and on behalf of Plaintiffs as a result of Defendants' negligent and fraudulent schemes.

168. On September 3, 2010, AFIC sent a bill for all of the Defendants' services to Plaintiff Sally James, through the U.S. Mail. The bill was created and mailed for the purpose of advancing the fraudulent scheme described above. The bill contained billings from or on behalf of all of the Defendants herein. The bill was in the amount of $9,635.00.

169. On October 20, 2010, AFIC sent a bill for all of the Defendants' services to Sally James, through the U.S. Mail. The bill was created and mailed for the purpose of advancing the fraudulent scheme described above. The bill contained billings from or on behalf of all of the Defendants herein. The bill was in the amount of $6,630.00.

## II. FACTUAL BACKGROUND

170. Plaintiffs hereby incorporate all averments set forth above as if each such averment were set forth verbatim herein.

171. In early to mid-2010, Mr. DiPretoro had behavioral problems that led him to become involved in legal troubles.

172. Ms. Wilcox learned of AFIC through her insurance company.

173. Prior to admitting Ms. Wilcox and Mr. DiPretoro to AFIC's

family therapy program, Ms. Wilcox researched AFIC's website and relied upon the promises and representations made therein.

174. Ms. Wilcox is also a registered nurse and her friend and coworker met Defendant Olson at a conference where Defendant Olson highly marketed and recommended AFIC.

175. Ms. Wilcox also had a phone conversation with Defendant Panio prior to their admission wherein Panio represented himself as a highly credentialed clinical psychologist.

176. Based on the promises and representations contained in AFIC's website and Defendant Olson's and Panio's oral promises and representations, Ms. Wilcox agreed to place her son at AFIC and herself in AFIC's family therapy and individual parenting therapy program.

177. At the first mandatory parent group therapy session, Defendant Panio started the therapy session off with a Polish joke. He told the group that a Polish person "takes a bath by walking up a flight of stairs and then pissing out the window. When the wind blows the piss back at him, that is his shower."

178. Panio continued the session using foul language throughout. He referred to people in jail as "butt fuckers." He used the word "douchebag" repeatedly.

179. During one of Panio's therapy sessions with Mr. DiPretoro, he called on Mr. DiPretoro by stating, "Hey, smiling douchebag in the back." When Mr. DiPretoro told Panio not to call him that, Panio told him he was a black belt in karate and would not hesitate to "kick [his] ass."

180. During another therapy session, Panio threatened Mr. DiPretoro that if he did not cooperate, Panio would have him sent to jail where he would "get butt fucked."

181. Mr. DiPretoro asked Panio if he was even a doctor, which greatly upset Panio. Panio told Mr. DiPretoro that he was a doctor and that he went to Harvard Medical School. Panio also told Mr. DiPretoro that he had been employed by the government on a research project testing how many drugs it took to kill consenting prisoners.

182. Prior to being at AFIC, Mr. DiPretoro had been prescribed Minocycline for acne. Panio took Mr. DiPretoro off of this medication, stating that no medications are allowed at AFIC.

183. Panio also diagnosed Mr. DiPretoro with Narcissistic Personality Disorder.

184. When Mr. DiPretoro stated that he wanted to leave AFIC, he was told he could not. When Mr. DiPretoro asked if he could contact his parole officer, his attorney and his mother, he was told that to do so would

conflict with his treatment and he could not.

185. Plaintiff Wilcox complained about Panio's profane language and was told she was "just not hearing what he has to say."

186. During subsequent parenting therapy sessions, Panio and Damicone tried to get Ms. Wilcox to agree to false statements, such as that she and Andrew were in an incestuous relationship and that her life revolved around him. When Ms. Wilcox refused to agree to these and other false statements, Ms. Damicone and Panio became upset with her and accused her of being "difficult" and being "slow."

187. Panio also told Plaintiff Wilcox, "you're wasting my time and should leave."

188. As a result of her complaining, asking questions and "being difficult," Ms. Wilcox was excluded from further parenting therapy sessions. She was also prohibited from seeing her son.

189. AFIC demanded that Ms. Wilcox bring her *other* son in for drug testing because AFIC suspected that he was also an addict. Ms. Wilcox reluctantly did as she was instructed.

190. In retaliation for what AFIC, Panio and Damicone deemed as a failure to cooperate with therapy, AFIC, Damicone and Panio drafted an October 19, 2010 letter to the Court supervising Mr. DiPretoro and falsely

told the Court that their patient, Ms. Wilcox, is "passive aggressive, defensive, blaming, minimizing not proactive, [and] non-responsive to educational principals and concepts."

191. This October 19, 2010 letter was knowingly sent through the United States postal service in an effort to advance Defendants' fraudulent scheme.

192. AFIC, Damicone and Panio further reported to the Court that their patient, Ms. Wilcox, has "modeled poor executive level of functioning" and that she was "given a directive on 10/12/2010 to reorganize her willingness to accept clinical information and reorganize a more affective parental posture in terms of holding her son accountable, which she has resisted since admission." The letter went on to falsely inform the Court that Ms. Wilcox had not participated in her son's therapy, when in fact they had precluded her for her questioning of Defendant Panio and his methods.

193. AFIC, Damicone and Panio further falsely reported to Mr. DiPretoro's probation officer that Mr. DiPretoro had violated probation. Despite repeated demands to know how and why Andrew had violated probation, AFIC, Panio and Damicone refused to discuss the matter with Plaintiffs. This report to the probation officer and separate report to the Court were, in fact, undertaken in retaliation for Ms. Wilcox's questioning

of Panio and AFIC.

194. These false reports to the court and probation officer affected Mr. DiPretoro's and Ms. Wilcox's legal rights and course and resulted in additional economic expenditures.

195. Defendants were paid many thousands of dollars by or on behalf of Plaintiffs.

196. As a result of the acts and omissions set forth herein, Plaintiffs Wilcox and DiPretoro have suffered and will continue to suffer injuries, damages and losses in an amount to be determined by the jury at trial.

## III. FIRST CLAIM FOR RELIEF: Violation of the Racketeer Influenced and Corrupt Organizations Act, "RICO," 18 U.S.C. §1962(c) (As against Defendants Panio and Mary Panio)

197. Plaintiffs hereby incorporate all averments set forth above as if each such averment were set forth verbatim herein.

198. Since at least 1989 and continuing to the present, for the purposes of the Racketeer Influenced and Corrupt Organizations Act, "RICO," 18 U.S.C. §§1961(4) and 1962(c), AFIC is an enterprise.

199. The activities of AFIC affect interstate commerce, as does the conduct of these Defendants.

200. For the purposes of RICO, the "RICO Persons" or "RICO

Defendants" pursuant to 18 U.S.C. § 1961(3) are Defendants Alexander Panio and Mary Panio.

201. At all times relevant, Defendants Alexander Panio and Mary Panio were associated with or employed by AFIC and were in the positions of executive management and/or ownership.

202. At all times relevant, Defendants Alexander Panio and Mary Panio conducted or participated, either directly or indirectly, in the conduct of AFIC's affairs.

203. At all times relevant, Defendants Alexander Panio and Mary Panio conducted and/or participated in AFIC's affairs through a pattern of racketeering activity and/or the collection of unlawful debt in violation of 18 U.S.C. § 1962(c) in that their common purpose was to defraud AFIC patients and their insurers, including Plaintiffs and their insurers, of money and property.

204. Defendants Alexander Panio and Mary Panio's pattern of racketeering activity in violation of 18 U.S.C. § 1962(c) includes the following enumerated racketeering acts defined under 18 U.S.C. § 1961(1), and described above in paragraphs 60-63; 71-79- 84-97; 117; 124-125; 130-137; 153-156; 160; 167-169:

a) Multiple acts of mail fraud in violation of 18 U.S.C. § 1341

by using the U.S. Postal Service for the purpose of advancing, furthering, executing, concealing, conducting, participating in or carrying out a scheme to defraud Plaintiffs and others similarly situated;

b) Multiple acts of wire fraud in violation of 18 U.S.C. § 1343 by using the Internet and interstate wires for the purpose of advancing, furthering, executing, concealing, conducting, participating in or carrying out a scheme to defraud Plaintiffs and others similarly situated; and

c) As to Defendant Panio, by interfering with commerce by threats or violence, in violation of 18 U.S.C. § 1951, by, *inter alia*:

1. Obtaining money or property from Plaintiffs by the use of fraud, fear and threats, as set forth in paragraphs 180-184 and 190-195 above.
2. Obtaining money or property from the Donabedian family by the use of fraud, fear and threats of prison and legal consequences, as set forth in paragraphs 60-63, 71-79, and 84-97 above.
3. Obtaining money or property from Ms. Crane by

the use of fraud, fear and threats, as set forth in paragraphs 117, 124-125, and 130-137 above.

4. Obtaining money or property from the James family by the use of fraud, fear and threats, as set forth in paragraphs 153-156, 160, and 167-169 above.

205. Defendants' pattern of racketeering activity has continued unabated for at least twenty years and continues to this day.

206. Despite multiple lawsuits involving similar allegations of fraud and racketeering, Defendants continue to operate AFIC and its Internet website with few modifications. Defendants' pattern of racketeering is continuous.

207. Plaintiffs were the victims of the acts of racketeering and the acts of racketeering were otherwise interrelated by distinguishing characteristics and were not isolated events.

208. Plaintiffs were injured in their business or property, within the meaning of 18 U.S.C. § 1964(c).

209. Defendants Alexander Panio and Mary Panio earned significant sums of money through their racketeering activity.

210. Plaintiffs paid Alexander Panio and Mary Panio significant

sums of money individually and through their insurance company.

211. Plaintiffs have had to pay attorneys money to respond to the issues contained in the fraudulent letter sent through the U.S. mail on or about October 19, 2010, as set forth in ¶¶190-91 above.

212. As a result of Defendants' pattern of illegal racketeering activities, Plaintiffs have suffered injuries, damages and losses compensable under RICO, including those set forth under 18 U.S.C. § 1964. In addition, Plaintiffs are entitled to attorney's fees and treble damages.

213. Because of the seriousness and continuity of Defendants' racketeering activities, the injuries caused by these racketeering activities, and the probability of future harm from these racketeering activities, Plaintiffs pray that this Court invoke the extraordinary remedies available under RICO. Those remedies include, *inter alia*:

a) An order compelling Defendants to divest themselves of any interest in AFIC, including its real property pursuant to 18 U.S.C. § 1964(a);

b) The imposition of reasonable restrictions on the future activities or investments of Defendants, including, but not limited to, a prohibition for these Defendants engaging in

the same type of endeavor or enterprise which violates 18 U.S.C. § 1964(a); and

c) An order dissolving or reorganizing AFIC pursuant to 18 U.S.C. § 1964(a).

## IV. SECOND CLAIM FOR RELIEF: CONSPIRACY TO VIOLATE RICO 18 U.S.C. § 1962(d) (As against Defendants Weiss, Olson, Damicone, Harrah and Jordan )

214. Plaintiffs hereby incorporate all averments set forth above as if each such averment were set forth verbatim herein.

215. As set forth in ¶¶ 167-182 above, Defendants Panio and Mary Panio violated 18 U.S.C. § 1962(c).

216. Defendants Weiss, Olson, Damicone, Harrah and Jordan conspired with Panio and Mary Panio to conduct or participate, directly or indirectly, in the conduct of the affairs of the enterprise, AFIC, through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(d).

217. In particular, Weiss, Olson, Damicone, Harrah and Jordan intended to further an endeavor of Defendants Panio and Mary Panio which, if completed, would satisfy all of the elements of a substantive RICO criminal offense, 18 U.S.C. § 1962(c), and adopted the goal of furthering or facilitating the criminal endeavor.

218. Plaintiffs were injured by Weiss, Olson, Damicone, Harrah and Jordan's overt acts that are acts of racketeering or otherwise unlawful under the RICO statute, which included, among other acts, acts of mail and wire fraud and/or conspiracy to commit same.

219. As a direct and proximate result of, and by reason of, the activities of Defendants Weiss, Olson, Damicone, Harrah and Jordan and their conduct in violation of 18 U.S.C. § 1962(d), Plaintiffs were injured in their business or property, within the meaning of 18 U.S.C. § 1964(c). Among other things, Plaintiffs suffered damages to the extent that Defendants fraudulently induced Plaintiffs to become and remain patients of the AFIC program at significant cost to Plaintiffs and their insurance company.

220. Plaintiffs are entitled to treble damages and attorneys fees as provided under RICO.

221. Defendants are jointly and severally liable to Plaintiffs for their damages.

## V. THIRD CLAIM FOR RELIEF: VIOLATION OF THE COLORADO CONSUMER PROTECTION ACT C.R.S. § 6-1-101 *ET. SEQ.*

**(As against Defendants Panio, Mary Panio, Harrah and AFIC)**

222. Plaintiffs hereby incorporate all averments set forth above as if

each such averment were set forth verbatim herein.

223. At all times relevant, Plaintiffs were consumers of Defendants' actual and promised services.

224. The AFIC Defendants, through the wide dissemination of their marketing and advertising materials through the Internet and through printed paper documents widely distributed, engaged in intentional violations of the Colorado Consumer Protection Act, C.R.S. § 6-1-101 *et seq*.

225. The AFIC Defendants made knowingly false promises, false representations and deceptive non-disclosures regarding the services to be provided to AFIC's consumers, including Plaintiffs, in violation of C.R.S. § 6-1-105(1)(a), (1)(e), (1)(g), (1)(i), (1)(u) and (1)(z).

226. Those knowingly false promises and representations and deceptive trade practices delineated above are incorporated herein. Among other things:

a) AFIC does not have any board certified psychiatrists on staff or in a consulting or supervising role;

b) AFIC is not a psychiatric hospital;

c) All of AFIC's "psychiatric" care is provided by a nurse, Defendant Olson, and upon the directions of the unlicensed

Panio;

d) AFIC's family therapy program specifically includes the triangulation and fragmentation of family members and the destruction of the family unit in many cases;

e) Panio does not have a legitimate PhD, is not licensed, is not a psychologist and is not a medical doctor or psychiatrist;

f) AFIC does not have any doctoral level therapists;

g) Many of AFIC's primary therapists are unlicensed;

h) Many of AFIC's providers are not licensed or qualified to perform the duties to which they are assigned;

i) AFIC's program is destructive to marriage and the family unit; and

j) AFIC's therapy program is dictatorial. The input of family members is not only discouraged but often ridiculed and dismissed.

227. Defendants actively conceal from actual and potential patients, including Plaintiffs, material facts in violation of §105(1)(u), including, *inter alia*:

a) Panio's lack of licensure;

b) The fact that Panio's PhD was not legitimately obtained;

c) Panio's true educational background and credentials;

d) AFIC's lack of supervision or oversight by a licensed psychiatrist;

e) The fact that all psychiatric treatment at AFIC is provided by a nurse, Defendant Olson;

f) That AFIC's *de facto* policy, created by Panio and carried out by Olson, is to abruptly, without proper tapering, without a proper, objective medical assessment or evaluation, and without proper consent, cease all psychotropic medications previously prescribed to AFIC's adolescent patients;

g) The fact that the discontinuation of the medications occurs without the active participation and monitoring by licensed psychiatrists specializing in medications and medication management;

h) That AFIC's *de facto* policy, also created by Panio and carried out by Olson and the other AFIC Defendants, is to change the diagnoses of AFIC patients to a "personality disorder" in order to justify the cessation of medications;

i) That such diagnoses are made without a proper, objective

medical assessment or evaluation and not by an individual with authority to make the diagnoses; and

j) The fact that AFIC regularly hired, utilized and retained staff who were not licensed to perform their stated duties.

228. These deceptive trade practices occurred in the course of Defendants' business, vocation or occupation.

229. Defendants' deceptive trade practices significantly impact actual or prospective consumers in the market for adolescent mental healthcare in the Denver metropolitan area, as well as in the State of Colorado.

230. Plaintiffs have suffered and will continue to suffer actual damages, losses and injuries resulting from Defendants' illegal, deceptive trade practices. Such damages include past and future medical and therapy bills as well as mental anguish, upset, emotional distress, anger, upset, horror, shock, disbelief, embarrassment and other similar injuries.

## VI. FOURTH CLAIM FOR RELIEF: NEGLIGENCE, INCLUDING BATTERY AND LACK OF INFORMED CONSENT (As against all Defendants)

231. Plaintiffs hereby incorporate all averments set forth above as if each such averment were set forth verbatim herein.

232. Defendants owed Plaintiffs duties of due care. Those duties

included, *inter alia*:

a) To involve licensed psychiatrists, physicians and caregivers in Andrew DiPretoro's care and treatment;

b) To properly assess, diagnose and treat Andrew DiPretoro;

c) To follow the wishes and directives of Plaintiff in regard to Andrew DiPretoro's care;

d) To be truthful and honest in all dealings with Plaintiffs and Plaintiffs' insurance company;

e) To follow all applicable standards of care;

f) To provide or cause to be provided to Plaintiffs' family and individual therapy that met applicable standards; and

g) To provide Andrew DiPretoro with all prescribed medications and treatments.

233. Defendants breached these duties of due care by engaging in the acts and omissions described above and by, *inter alia*:

a) Engaging in acts of dishonesty and untruthfulness;

b) Failing to obtain proper medical and psychiatric consultations for Andrew DiPretoro;

c) Failing to provide Andrew DiPretoro with prescribed medications;

d) Failing to reasonably, accurately and appropriately diagnose Andrew DiPretoro's medical and psychiatric condition;

e) Providing or causing to be provided substandard and reckless care and family therapy;

f) Allowing or participating in the fragmentation and triangulation of Plaintiffs' family; and

g) Failing to properly and appropriately treat Andrew DiPretoro's medical and psychiatric conditions.

234. Defendants AFIC and Alexander Panio also provided care and treatment to the Plaintiffs without informed consent. In particular, Plaintiffs did not consent to being treated by unlicensed personnel and did not consent to a program that was operated, managed and supervised by Defendant Panio, who was unlicensed and who did not make this disclosure to Plaintiffs.

235. Defendant Mary Panio, as co-owner and co-chair of the AFIC Executive Committee, owed Plaintiffs a duty to ensure that AFIC was properly staffed with qualified individuals and that AFIC's program met all applicable standards.

236. Defendant Mary Panio breached these duties of due care by ratifying, tolerating and acquiescing in the conduct described herein.

237. Defendant Weiss owed a duty of due care to Plaintiffs, including the duty to, *inter alia*:

a) Ensure that Andrew DiPretoro received appropriate medical and psychiatric consultations;

b) Ensure that Andrew DiPretoro received care coordinated by licensed physicians and personnel;

c) Ensure that AFIC personnel provided Andrew DiPretoro with medications prescribed by his licensed physicians;

d) Ensure that the Plaintiffs received family therapy by qualified personnel and family therapy that met appropriate standards;

e) Provide reasonable care that was consented to; and

f) Ensure that Andrew DiPretoro's medical and psychiatric care was not being provided by unlicensed or unqualified personnel, such as Defendant Panio.

238. Defendant Weiss breached these duties of due care by engaging in the acts and omissions described above and by, *inter alia*:

a) Abandoning her duties as a medical director;

b) Allowing unlicensed personnel to see and treat Andrew DiPretoro;

c) Ratifying the poor care and medications management provided by Defendant Olson;

d) Ratifying the provision of substandard family therapy provided by unlicensed and unqualified individuals;

e) Ratifying and acquiescing to the fragmentation of Plaintiffs' family; and

f) Allowing unlicensed personnel to make changes to Andrew DiPretoro's medical care and treatment, including the discontinuation of medications prescribed by a licensed physician.

239. Defendant Olson owed Andrew DiPretoro a duty to provide reasonable and appropriate medications management and psychiatric nursing services.

240. Defendant Olson breached these duties by engaging in the acts and omissions described above and by, *inter alia*:

a) Abruptly ceasing Andrew DiPretoro's medications without a reasonable medical basis, against the orders of his physicians, and without proper informed consent;

b) Refusing to re-start the medications after Andrew DiPretoro's condition deteriorated;

c) Allowing the other Defendants to abuse Plaintiffs; and

d) Ratifying or participating in the fragmentation of the Plaintiffs' family.

241. Defendant Jordan owed Plaintiffs a duty to perform tasks within the scope of her practice as a licensed practical nurse.

242. Defendant Jordan violated this duty of care by practicing beyond the scope of her licensure by, among other things:

a. Participating in the diagnosis and treatment of Andrew DiPretoro's mental illness;

b. Participating in the decision to discontinue Andrew DiPretoro's medications;

c. Carrying out the discontinuation of Andrew DiPretoro's medications; and

d. Acting as Andrew DiPretoro's medical provider during his admission.

243. As a result of these negligent acts and omissions and battery, Plaintiffs have suffered and will continue to suffer economic and non-economic loss, including past and future hospital, doctor and therapy bills; and non-economic loss, including upset, emotional distress, anger, fear, humiliation and embarrassment.

## VII. FIFTH CLAIM FOR RELIEF: UNAUTHORIZED PRACTICE OF MEDICINE (As against Defendant Panio by Andrew DiPretoro)

244. Plaintiffs hereby incorporate all averments set forth above as if each such averment were set forth verbatim herein.

245. Defendant Panio engaged in the unauthorized practice of medicine, without a license, by *inter alia*:

a) Providing medical advice and care to and on behalf of Andrew DiPretoro;

b) Using fraud and misrepresentation to cause changes in Andrew DiPretoro's medical care and treatment;

c) By causing the discontinuation of Andrew DiPretoro's psychiatric medications without the advice or participation of a licensed physician; and

d) Falsely holding himself out as a licensed physician for the purpose of affecting the course of Andrew DiPretoro's medical care and treatment.

246. Defendant Panio received a fee, either direct or indirect, from his unauthorized practice of medicine.

247. As a result of Defendant Panio's unauthorized practice of medicine, Plaintiff has suffered the injuries, damages and losses set forth

herein. Plaintiff is entitled to a refund of fees paid to Defendant, either direct or indirect. Plaintiff is further entitled to an award of attorney's fees pursuant to C.R.S. § 12-36-129(4)(a).

## VIII. SIXTH CLAIM FOR RELIEF: FRAUD, INCLUDING FRAUD IN THE INDUCEMENT AND FRAUDULENT NONDISCLOSURE (As against Defendants Panio and AFIC)

248. Plaintiffs hereby incorporate all averments set forth above as if each such averment were set forth verbatim herein.

249. Defendants Panio and AFIC made several false statements of material facts to Plaintiffs in order to secure Andrew DiPretoro's admission to AFIC and in order to keep him as a patient of AFIC.

250. Those false statements, false representations and fraudulent nondisclosures include the statements set forth above, which are incorporated herein, as well as:

a) Defendant Panio's repeated statements and representations concerning his status as a doctor or licensed therapist with a doctoral degree;

b) Defendant Panio's and AFIC's intentional failure to disclose the material fact that Defendant Panio was not a doctor or doctoral-level licensed therapist;

c) Defendant AFIC and Defendant Panio's intentional failure to inform Plaintiffs that Andrew DiPretoro's medical care was not supervised by a licensed physician;

d) Defendant Panio's false statements regarding AFIC's re-admission rate as compared to its competitors; and

e) Defendant AFIC and Panio's intentional failure to disclose to Plaintiff Jennifer Wilcox that Ms. Wilcox would not be openly and actively involved in Andrew DiPretoro's treatment.

251. All of the above statements and nondisclosures involve material facts.

252. Defendants had a duty to disclose truthful material facts to Plaintiffs about these issues.

253. Plaintiffs justifiably relied on Defendants' false statements and fraudulent nondisclosures.

254. Plaintiffs took courses of action that they would not have otherwise taken had she been provided with truthful material facts concerning Defendants' program and Defendant Panio's conduct.

255. All of the above statements of fact and non-disclosures of fact were intentional and otherwise intended to cause Plaintiffs to have and

possess a false understanding of the true material facts.

256. As a result of Defendants' fraud and fraudulent non-disclosure, Plaintiffs have suffered and will continue to suffer actual damages in an amount to be determined by the jury.

## IX. SEVENTH CLAIM FOR RELIEF: CIVIL CONSPIRACY (As against all Defendants)

257. Plaintiffs hereby incorporate all averments set forth above as if each such averment were set forth verbatim herein.

258. The Defendants conspired with and planned with one another to engage in the unlawful acts and omissions described above.

259. In particular, the Defendants conspired and planned with one another to create an adolescent treatment program which would be operated and managed by Defendant Panio, who is unlicensed and unable to provide the nature and extent of care, treatment and care coordination promised to Plaintiffs and others similarly situated.

260. Defendants further conspired and planned with one another to engage in a pattern and practice of fraud, deception and false advertising concerning the nature and types of services to be provided.

261. Defendants further conspired and planned with one another to create an adolescent treatment program run and staffed by unsupervised and

unlicensed personnel who do not have the qualifications or legal authority to perform the services promised or required.

262. Defendants further conspired and planned with one another to create a program where AFIC's patients would be improperly taken off of their psychotropic medications without proper assessment, without psychiatrists' involvement and without regard to the individual needs of each patient.

263. Defendants conspired and planned with one another to defraud Plaintiffs' insurance company, and thus Plaintiffs, by representing Defendant Panio to be a licensed physician capable of diagnosing Andrew DiPretoro's mental health issues as well as prescribing medications and the course of treatment for those illnesses.

264. As a result of this civil conspiracy, Plaintiffs have suffered actual damages in an amount to be determined by the jury at trial.

265. As a result of this civil conspiracy, each of the Defendants are jointly and severally liable for Plaintiffs' damages.

## X. PRAYER FOR RELIEF

WHEREFORE for the reasons set forth herein, Plaintiffs pray that this honorable Court enter judgment in their favor and against Defendants for all claims of relief and, following trial to a jury, award the following

damages:

a) Economic loss;

b) Non-economic loss;

c) Actual damages;

d) Treble damages under the CCPA;

e) Treble damages under RICO;

f) Regurgitation of fees paid by or on behalf of Plaintiffs to Defendants;

g) Attorney's fees under the CCPA and RICO;

h) Pre and post-judgment interest;

i) Extraordinary relief under RICO;

j) Joint and several liability for these damages; and

k) All Court costs.

**PLAINTIFFS REQUEST TRIAL TO A JURY OF SIX**

Respectfully submitted this 5th day of December, 2012.

LAW OFFICES OF J.M. REINAN, P.C.

/s/ Jerome Reinan

Jerome Reinan, #22031
Jordana Griff Gingrass, #38195
1437 High Street
Denver, Colorado 80218-2608
(303) 894-0383
(303) 894-0384 FAX
*Attorneys for Plaintiffs*

Plaintiffs' address:

8735 S. Aberdeen Circle
Highlands Ranch, Colorado 80130